**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Daniel Gilliland, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER GRANTING MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| Contract Land Staff, LLC, and | ) | Case No. 1:17-cv-191 |
| North Dakota Pipeline Company, LLC | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff alleges in his Second Amended Complaint he was a victim of age discrimination and retaliation after reporting allegations of age, race, and sex discrimination. He seeks relief under the ADEA,[1] Title VII,[2] and the NDHRA.[3] (Doc. No. 6).

Before the court now is defendants' motion for summary judgment. Following the filing of the motion, defendant Contract Land Staff, LLC was dismissed based upon stipulation of the parties, leaving North Dakota Pipeline Company, LLC as the sole defendant.

## I.    BACKGROUND

Unless otherwise indicated, what follows is undisputed, has not been sufficiently controverted, or is claimed as fact by plaintiff and will be assumed true for purposes of the present motion.

---

[1] The Age Discrimination in Employment Act of 1967.

[2] Title VII of the Civil Rights Act of 1964.

[3] The North Dakota Human Rights Act.

## A.    NDPL retains CLS for the Sandpiper Project

In January 2012, Enbridge (U.S.), Inc. and Enbridge Energy Partners, LP (collectively "Enbridge") entered into a Master Services Agreement ("MSA") with Contract Land Staff, LLC ("CLS").  The MSA set forth the general terms and conditions under which services would be performed by CLS on projects undertaken by Enbridge or its affiliated companies.  (Doc. No. 26-2).  CLS is a company that provides right-of-way procurement services, including supplying right-of-way agents and administrative staff.  (Doc. Nos. 6, ¶ 2; 26-1, p. 56).

Relevant here, the MSA provided that CLS would be an independent contractor, CLS would be responsible for the "specific manner, means, and methods" of services performed, and that any personnel furnished by CLS would not be employees of Enbridge or it affiliated companies unless specifically provided otherwise.  The MSA also gave Enbridge and its affiliated companies the right to remove CLS personnel working on assigned projects as follows:

> Company [Enbridge] reserves the right to demand the immediate removal and/or replacement of any member of Contractor Group [CLS] for non-compliance with the requirements of this Agreement or a Work Release Contract. Contractor shall immediately replace, at its own expense, any member of Contractor Group whose presence on Company's Premise's is detrimental to the operations thereon, as determined by Company in its sole but reasonable judgment.

(Doc. No. 26-2).

Pursuant to the MSA, CLS was retained to perform work on Enbridge's Sandpiper Pipeline Project ("Sandpiper Project" or "Project")—a crude oil pipeline that was to span approximately 600 miles from western North Dakota to Wisconsin.  (Doc. Nos. 6, ¶ 6; 26-2, p. 9).  The parties agree that North Dakota Pipeline Company, LLC, an Enbridge affiliate, is the proper party defendant in this case, and it and Enbridge will be collectively referred to as "NDPL."

### B.    CLS assigns plaintiff to the Sandpiper Project

Plaintiff first began doing work for CLS in 1999, when he was around the age of sixty-one. Plaintiff worked on various CLS engagements across the country for different customers. If other work was not available upon plaintiff completing a project, CLS would place him on furlough. (Doc. Nos. 6, ¶ 6; 26-1, p. 28).

In March 2013, CLS assigned plaintiff to the Sandpiper Project as project manager for the North Dakota segment. In making the assignment, CLS had plaintiff sign an employment agreement for the work to be performed on the Project. The employment agreement and a separate employment placement form both have CLS's name at the top and no one from NDPL was a party to signing either document. The employee placement form lists "Sandpiper" as the client and the employment agreement states that the duration of plaintiff's employment on Project was "tbd" (*i.e.*, to be determined). (Doc. No. 26-1, pp. 291–97). Consistent with the MSA, plaintiff understood NDPL was a customer of CLS, and CLS was an independent contractor to NDPL. (Id., pp. 36–37).

Plaintiff was 74 years old when he began work on the Sandpiper Project. (Doc. No. 6, ¶ 6). Both the CLS Employee Handbook and a CLS right-of-way procedures handbook specific to the Project contained discrimination and harassment policies that directed CLS employees to report complaints having to do with these subjects to their direct supervisor and/or the CLS HR Department. (Doc. No. 26-1, pp. 43–48, 339–47). Plaintiff also attended a harassment training session within 30 days of his employment and annually thereafter; these were conducted by CLS. (Id.).

As CLS's manager for the North Dakota segment, plaintiff oversaw a team of eight right-of-way agents, as well as a right-of-way supervisor. The team performed work associated with acquisition of

Project rights-of-way. (Doc. No. 26-1, pp. 56–58). Plaintiff's management of his team included reviewing right-of-way agents' files for accuracy, approving agents' activity notes, and approving their timesheets. (Id., pp. 62–64, 194–97). Plaintiff performed most of his work on the Project out of a CLS-leased office located in Minot, North Dakota. (Id., p. 71).

Plaintiff was salaried employee of CLS while working on the Project. He was paid $400 per day six days a week and also received a per diem. (Doc. No. 26-1, pp. 69–70).

Plaintiff's direct supervisor initially was Matt Potter and later Liz Babcock—both CLS employees. Potter and Babcock, in turn, reported to Kerry Malone, the CLS Officer-in-Charge of the Project. CLS's command structure was separate from that of NDPL. On the NDPL side, Mike Bradburn, a land supervisor, had immediate responsibility for right-of-way acquisition for the Project. Bradburn reported to John McKay, the Senior Manager for Land Services for U.S. Projects and the highest ranking NDPL official with active involvement in the right-of-way acquisition for the Project. (Doc. No. 26-2, pp. 16–17, 21). Directly under Bradburn was Darryl Sayler. He was the NDPL person with a physical presence in North Dakota and the NDPL person who interfaced directly with plaintiff's team on the North Dakota segment. (Id., pp. 25–26).

In a deposition taken in this action, plaintiff described his management role as limited to overseeing the work of other CLS employees in obtaining permissions for survey work and easements. He denied being in charge of title work or having other administrative responsibilities for the North Dakota segment. (Id.) However, his position as project manager for the North Dakota segment as well as the fact that at least one CLS person who performed some administrative work reported to him reasonably suggested to NDPL that he had responsibility for at least some of the administrative work on the North Dakota segment,

if not all of it. Further, as discussed below, one of the complaints that NDPL had with respect to CLS's work on the Project had to with document inaccuracies, including on the North Dakota segment. John McKay, the highest-ranking NDPL person involved in the decision to have plaintiff removed from the Project as discussed in more detail in a moment, perceived plaintiff as responsible for at least some of the documentation that NDPL believed to faulty. According to McKay, CLS's right-of-way agents had "a major role in accurately documenting acquisition steps" and plaintiff was responsible for overseeing the right-of-way agents' work. (Doc. No. 26-2, p. 63).

### C.    NDPL's dissatisfaction with CLS's performance

Not long after commencement of right-of-way acquisition for the Sandpiper project, NDPL took issue with CLS's performance. Initially, the problems centered on the Minnesota segment. In the spring of 2014, NDPL directed that CLS make management changes for work being performed on that segment, including seeking removal of plaintiff's Minnesota counterpart from his position as manager of CLS's work on the Minnesota segment. At the time he was 33 years old. (Doc. Nos. 26-2, p. 80; 41-1, p. 2).

Another area of concern that developed had to do with use on the Project of MPROW, NDPL's right-of-way management software. Initially, CLS used its own right-of-way management software on the Project but, in the latter part of 2014, was directed by NDPL to transition to MPROW. (Doc. Nos. 26-2, p. 31–33). There is evidence there were incompatibilities in the two software systems and other problems that led to delays in MPROW's full implementation. The delays led to frustration on the part of NDPL's management, particularly Senior Manager McKay, who on May 29, 2015, threatened management changes if CLS did not get with the program, so to speak. (Doc. No. 26-2, pp. 133–34, 316–17). In an email sent to NDPL and CLS personnel, including plaintiff, McKay stated in part:

5

It's very disappointing to hear that the files, documents and reporting have been less than stellar on this project to date.

I don't want to hear anymore excuses about Enbridge systems or processes. Our systems and processes are working very well with other land providers on multiple other land providers on multiple other projects.

If I don't see some significant improvement, I will need to consider changes soon.

(Id.). There is evidence that NDPL's concerns over CLS's personnel's ability to master MPROW continued into the summer of 2015, including the fact that CLS had not been tracking valve sites in MPROW. (Doc. No. 26-4, pp. 17, 26).[4]

In addition to NDPL's dissatisfaction with CLS's implementation of MPROW and the earlier Minnesota segment problems, NDPL had other concerns with respect to CLS's performance, including: (1) purported mistakes in filed easements and other documentation errors; (2) plat maps being attached to recorded easements in some instances (which NDDPL did not want, desiring the flexibility of a more general location for the pipeline as described in the body of the easement over a more specific location suggested by the maps) with examples of at least two such instances on the North Dakota segment being made a part of the record;[5] (3) record keeping and file organization; and (4) delays in getting checks to landowners. (Doc. Nos. 26-1, pp. 62–67, 83–86, 316–34, 343; 26-4, pp. 24–27; 29-1; 41-5, p. 5).

---

[4] The evidence is in dispute as to when the MPROW was fully implemented and the reasons for the delays. Also, there is evidence that McKay did not bother to inform himself of the depth of problems in transitioning from CLS's system to MPROW and may have been heavy-handed when he told CLS to get with the program or changes in CLS management would be sought.

[5] What is not clear is whether the record evidence of two easements being recorded with attached plat maps were the only two on the North Dakota segment or whether there were others. Further, if only a few, these may be instances where the landowner would not sign without the location of the pipeline being more particularly described, and its is not clear from the record what NDPL's desires were in such instances. Further, it is not clear from the record whether NDPL personnel bothered to inquire why plat maps were attached in some instances to recorded easements. One gets the impression from reading the record that *some* of the NDPL personnel critical of aspects of CLS's performance were either not very experienced or not well-informed, or both.

In recognition of NDPL's dissatisfaction with CLS's performance with respect to at least some of these matters, CLS Supervisor Liz Babcock sent an email to NDPL's Mike Bradburn in June 2015, stating she had held several meetings with CLS project management to discuss needed improvements and outlined a long list of steps that CLS would be taking. At the end of the email, Babcock stated: "Thanks in advance for allowing us to correct/adjust our efforts to meet your needs." Plaintiff was among a number of CLS personnel copied on the email. (Doc. No. 41-5).

Whether justified or not, NDPL continued to be dissatisfied with CLS's performance. (Doc. Nos. 26-2, pp. 62–68; 29-6, p.2). On or about, August 3, 2015, NDPL demanded that CLS make additional management changes, including removal and replacement of plaintiff as the manager for the North Dakota segment and a demand that CLS add management support for the Minnesota segment. (Doc. No. 29-7). This was contemporaneous with NDPL expressing concern about continued problems with respect to record keeping and file management among other things. (Doc No. 29-6, p.2).

At some point, NDPL engaged another right-of-way company to assist in an of audit of the right-of-way acquisition files. The audit purportedly found a high rate of documentation errors, including on the North Dakota segment. Eventually, this led to NDPL ending its contractual relationship with CLS around the end of 2015 and efforts being made to reacquire easements that were problematic, including on the North Dakota segment. According to the audit report, only 51.96% of the North Dakota tracts (397 out of 759) were found to be "valid," with 11.28% having a priority 1 status and the remaining 36.13% a priority 2 status. (Doc. No. 26-2, pp. 75–79).

In the second quarter of 2016, the Sandpiper Project was cancelled altogether for reasons

unrelated to CLS's allegedly deficient performance. (Doc. No. 26-2, pp. 11, 94). In July 2017, NDPL

filed suit in state court in Texas seeking damages from CLS for its allegedly deficient performance. (Doc.

Nos. 26-1, p. 125; 29-4).

### D.  Plaintiff's removal from the Project

Plaintiff worked on the Sandpiper Project for almost two and a half years. As already noted,

NDPL had CLS remove plaintiff from the Project on or about on August 3, 2015. Relevant to what comes

later, the communication directing plaintiff's removal was not made to him personally. Rather, the direction

came from NDPL's Mike Bradburn and was made to CLS Project Supervisor, Liz Babcock. Babcock,

in turn, informed plaintiff he was being removed from the project, stating it was at the direction of NDPL.

(Doc. No. 26-1, pp. 109–10).

Also, as noted earlier and relevant to what follows, plaintiff's removal was among other

management changes requested at the same time and followed the management changes that NDPL

required over a year earlier. Notably, CLS's Sr. Vice President Kerry Malone stated the following in an

email dated August 3, 2015 to the person in charge of personnel for CLS:

> I spoke to Liz this AM and we are being asked to remove Dan Gilliland from the project
> and to add a new Manager in ND and also to add a Manager in MN to support Josh
> Trepl. I believe they also need an additional ALS to be added to Grand Forks. Since
> Enbridge has already fired every manager we have, I am wondering who might be
> candidates for the positions. I was surprised that Sheri Kelley was not just promoted but,
> much to my surprise, Liz indicated there were some concerns with Sheri.will discuss this
> issue with Brent but you and I need to put our heads together about new managers for
> Sandpiper.

(Doc. No. 29-7).

Senior Manager for Land Services John McKay testified that he made the decision to have plaintiff

removed from the Project in collaboration with Mike Bradburn who reported to him. (Doc. No. 26-2, pp. 67–68). Plaintiff in his response to the motion for summary judgment acknowledged that McKay was the person responsible for this removal from the Project. (Doc. No. 29, p. 2).

Upon being informed he was being removed from the Project at the direction of NDPL, plaintiff reached out by email to McKay for reasons why. McKay had Bradburn respond, and, on August 11, 2015, Bradburn sent plaintiff an email stating:

> Dan,
>
> I just wanted to clarify that the main reasons Enbridge wanted a change in the management of CLS Land Services on the SPP and Line 3 South Projects was due to continuous errors in the documents, untimely recording of documents and not adhering to Enbridge policy for storing and filing documents. Over the last several months this has been brought to CLS's attention several times on conference calls, emails, and face to face meetings.
>
> Thanks for your time spent on the projects and good luck in the future.
>
> Mike Bradburn

(Doc. No. 26-1, p. 341). When deposed in this action, McKay similarly articulated NDPL's reasons for seeking plaintiff's removal as follows:

> A.    The three predominant reasons that I recall were the - - obviously, the quality of the documents; the file management which includes the entries by CLS folks into the MP right-of-way system; and I believe there were issues with timely recording as well as of those easements for land rights.

(Id., p. 66).

Upon receipt of Bradburn's email, plaintiff expressed the following thoughts in an email dated August 13, 2015:

> Liz Babcock was in the office on Tuesday and notified me that Enbridge was terminating my services on the Sandpiper Project. She told me that Mike Bradburn, Jay Manders and others were in a meeting with her last and told her the reason was They needed a stronger Manager on the Project. She indicated that Darryl Sayler had told them that I was the only

one in the office most of the time and I did not make the other employees come to work in the office. He had also told Mike Bradburn that almost always I told him to go to Sheri and Nanci if he had questions leading them to believe I did not know the answer to the questions. I always answered all of his questions when he would come into the office himself (which was rarely) but always checking up on us and always giving them negative reports. Darryl started doing this after I sent him a reply email telling him that I did not appreciate his coming down so hard on my employees. I have a copy of this letter attached. Darryl since has made several smarty comments to me and I quote "You can see you didn't hurt me, I am still here aren't I" Twice more recently he has made the almost identical comment in a very snide snickering way and I quote "You see I am still here and I am moving up"! Darrel used to come into the office almost every day but up until this past week he has only been to the office twice. He slipped in unannounced on Tuesday of this week 8/11-15 and Sheri, Troy had just left the office to go to lunch. It was just after 2:00PM and of course, I had locked the office doors upstairs as no one was here while we were gone except for Sarah Roberts in the Down stairs Admin. Office. His comment to Sarah was (Is no one working today). Sarah explained that we had been busy with Agents in the office all morning and just now had time to take a break and go have a late lunch. This happens very often as we hardly ever know when we will get to go eat lunch. I have been watching this situation ever since I sent the email to Darryl and it has become very evident that he is joining with his direction and I could see the building of a conspiracy to get rid of me. Darryl Sayler, Mike Bradburn, Jay Manders, John McKay, Corissa Seeley, Kyra Berkness and Kim Izzard and the strong leaders of this conspiracy More and more every day they are making everything harder for all of us with CLS on the Project. This email from Mike Bradburn, copied to John McKay states what they have come up with for a reason. I had sent an email to John McKay asking him on his take on why this action was taken and He did not have what it takes to reply to me himself. He had Mike Bradburn do it. I am also attaching a copy of this email I sent to John McKay and a copy of two emails from him Praising Me Personally and The entire CLS Team for our excellent work on this project. I think it is fairly clear as to what is happening with all we, ME and CLS employees are being blamed for. There is PLENTY of evidence that their MPROW system is in deplorable condition but we are being blamed for everything that goes wrong with Documents and everything they can blame us for. They send reports and emails to John McKay about how bad everything is and never send him anything that it was not our fault, it is their system (MPROW) that is not working like it is supposed to work. The three Ladies mentioned are blaming everything bad on us but never correct anything that was blamed or wasn't our fault to start with. I have been saying all along that they are working on getting rid of me and bringing someone from Enbridge to run this office. I will be writing more and more on this as time goes on now that my last day on this Sandpiper Project is Saturday 8-15-2015

WHEN I CONTINUE, IT WILL BE HOW THEY PRAISED ME AND ALL THE CLS TEAM AS LONG AS WE WERE BUYONG THE NORTH DAKOTA 300 MILES OF THIS PROJECT IN JUST 90 DAYS DURING THE COLDEST WINTER IN HISTORY FOR ND. THE MONTHS OF DECEMBER 2013 AND JANUARY AND FEBRUARY 2014. MN TOOK LOTS LONGER AND WAS NOT BOUGHT 95% UNTIL XXXX.

AFTER THIS, IT HAS BEEN ALL DOWN HILL FOR US, ENBRIDGE USED AND

PRAISED US FOR THE GREAT WORK DONE FOR THEM AND NOW THROWING
US AWAY.

(Doc. No. 29-5, pp. 2-2) (punctuation and other errors in original). While plaintiff blamed his removal from the Project and what else was happening to CLS on the MPROW and a cabal of NDPL personnel seeking to take over CLS's work, there is not one mention in his contemporaneous and lengthy comments about age discrimination or his being terminated in retaliation for complaints about age and other forms of discrimination.

In September 2015, plaintiff sent an email to McKay and James Watt, expressing plaintiff's disappointment in being removed from the Project. (Doc. No. 29-5, p. 6). The email stated, among other things, that "not hearing from [NDPL] indicates you have no concern over the fact that you have hurt me so much," "this is going to get nasty!" and that "If Enbridge elects to get CLS and all my CLS Family Members involved in any way that would harm them, then you can expect the ultimate." (Id.) McKay forwarded plaintiff's September 22, 2015, email to several NDPL employees and asked whether NDPL security needed to get involved. (Doc. No. 26-2, p. 87). Following this expression of concern by McKay, CLS spoke with plaintiff and verified that he never intended to physically threaten anyone, and this information was communicated back to NDPL. (Doc. No. 26-2, p. 88). Plaintiff testified, that, following CLS inquiring about his September 22 email, he believed he was placed on a U.S. Homeland Security watch list for sixteen months. But, in his deposition, plaintiff acknowledged he was never told he was placed on a security list, rather he was only shown a copy of McKay's email inquiring into whether plaintiff posed a threat. (Doc. No. 26-1, pp. 74–76). McKay, in his deposition, testified he had no knowledge of plaintiff being placed on either a U.S. Homeland Security or an Enbridge pipeline security list (Doc. No.

26-2, p. 89), and there is no evidence that he ever was.

At the point of plaintiff's removal from the Project, work on the North Dakota segment was winding down because most of the right-of-way on that segment had been acquired. Plaintiff was not replaced by anyone from CLS. Rather, NDPL brought in a person from another land service company who took over some of plaintiff's responsibilities. (Doc. Nos. 26-3, pp.21–22). Plaintiff asserts that this person was younger and he likely was based upon probabilities, although there appears to be no specific record evidence of that fact.

### E.      Plaintiff placed on furlough by CLS following removal from the Project

Prior to his last day on the Project, plaintiff emailed several people associated with CLS expressing his desire to be placed on another project after a few days off, and CLS's staffing manager responded, expressing CLS's desire to have plaintiff return to work on a future project.   (Doc. No. 26-1, pp. 339–40). Plaintiff was furloughed by CLS after his last day on the Project and assigned on-call status for future CLS projects. (Doc. No. 26-1, p. 338).  In a CLS Project Completion Interview Report, CLS Supervisor Babcock gave plaintiff high marks for his work on the Project, complimenting him on his professionalism. With respect to "Quanity-quality of work," Babcock stated: "Dan is a great leader and mentor for his team. The client requested a change in this position." (Id.).

In February 2016, plaintiff asked CLS to be considered for a right-of-way project in Kentucky, but later was informed that the Kentucky client had decided to hire right-of-way agents from Kentucky or the surrounding area. (Doc. Nos. 26-1, p. 346, 41-3, p. 2).  CLS stated it would keep him posted on other projects, but stated it was "very quiet right now." (Doc. No. 41-3, p.2). Plaintiff stated that, after he did not get the Kentucky job, he knew he would not find another job because of a downturn in the right-

of-way industry. In March 2016, plaintiff emailed CLS and ended his relationship with the company. (Doc. No. 26-1, p. 344).

### F. **Plaintiff's allegations of discrimination and retaliation**

On May 25, 2016, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging age discrimination and retaliation under the ADEA and Title VII. On June 29, 2017, the EEOC issued Right to Sue Notices, finding no reasonable cause that discrimination had occurred. (Doc. No. 6).

Plaintiff alleges in his Second Amended Complaint claims for (i) age discrimination in violation of the ADEA (Count One); (ii) age discrimination in violation of the NDHRA (Count Two); and (iii) retaliation in violation of the ADEA and Title VII (Count Three). Plaintiff seeks recovery from NDPL on all counts, alleging that NDPL was a joint employer with CLS. (Doc. No. 6).

Plaintiff's evidence that his removal on the Project was because of his age focuses upon inquiries/comments by four NDPL employees about his age, why he wanted to continue working at his age, and whether he had any plans to retire. According to plaintiff, these age and retirement related inquiries/comments were made at various times during the Project by Darryl Sayler, Trevor Seely, Jay Manders, and Mike Bradburn. (Doc. No. 26-1, pp. 138–49). Plaintiff's evidence relating to his claim of age discrimination will be addressed in more detail later.

In addition to claiming age discrimination, plaintiff contends he was retaliated against after he claimed there was age, race, and sex discrimination on the Sandpiper Project. However, except for one vague reference by plaintiff in his deposition that he complained to an NDPL official about remarks made by Sayler touching upon his age, none of plaintiff's allegations of racial and sex discrimination were made

13

to NDPL. Not surprisingly in view of this and other problems with respect to the retaliation claim, plaintiff made no attempt to respond to NDPL's arguments for why it should be dismissed in his response to the motion for summary judgment.

## II.   LEGAL STANDARD

The court is well familiar with the law governing motions for summary judgment under Fed. R. Civ. P. 56. See, e.g., Celotex Corp v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Lonesome Dove Petroleum, Inc. v. Holt, 889 F.3d 510, 514 (8th Cir. 2018).

## III.   THE RETALIATION CLAIM

The court will dismiss plaintiff's retaliation claim based upon his apparent abandonment of it. But, even apart from that, there is a lack of evidence from which a reasonable jury could conclude that NDPL retaliated against plaintiff for purportedly claiming there was age, wage, sex, or racial discrimination on the Project.

## IV.   THE FEDERAL AND STATE AGE DISCRIMINATION CLAIMS

### A.   NDPL was not plaintiff's employer for purposes of the ADEA or the NDHRA

It is undisputed that plaintiff was an employee of CLS. For NDPL to be liable under the ADEA, it must also have been plaintiff's employer for purposes of the Act. The same is true under the NDHRA for the particular claim being made by plaintiff under that law.

#### 1.   Governing law

##### a.   Introduction

The ADEA generally defines an "employer," with certain exclusions, to be a person who has a specified number of "employees" and then defines "employee," with certain exclusions, to be "an individual

employed by an employer." 29 U.S.C. § 630(b), (f). In applying the ADEA and other federal laws prohibiting discrimination that similarly define "employer" and "employee," federal courts (including the Eighth Circuit in cases discussed later) have liberally construed the laws to provide that an employee can have more than one employer in what arguably are two distinct situations. The first are those cases where separate but *related* entities are treated as a single enterprise or employer. For ease of reference, these cases will be referred to as "single employer" cases. The other category of cases are those where courts have held separate and *unrelated* entities to both be an employer. These cases will be referred as "joint employer" cases. See, e.g., United States Employment Opportunity Commission v. Global Horizons, Inc., 915 F.3d 631, 637–38 (9th Cir. 2019) ("Global Horizons") (discussing the difference between single employer and joint employer cases); Bristol v. Board of Com'rs of Cty of Clear Creek, 312 F.3d 1213, 1217–18 (10th Cir. 2002) (same); Burnell v. Tealwood Care Centers, Inc., Civ. No. 16-3001, 2018 WL 4293150, at *13 (D. Minn. July 10, 2018) ("Burnell") (same). In this case, since NDPL and CLS are not corporately related, a joint employer analysis is required.

NDPL contends that a four-factor test used by the Eighth Circuit to determine whether an entity is an employer in single employer cases brought under federal anti-discrimination laws also applies in the Eighth Circuit to joint employer cases and plaintiff in his response brief has agreed. As for the NDHRA, neither party addressed the issue of what test the North Dakota courts would employ, apparently assuming it would be the same four-factor test. The undersigned, however, does not believe the four-factor test is the governing one in the Eighth Circuit for joint employer cases. Further, the court doubts the North Dakota Supreme Court would employ it.

### b. The four-factor test employed by the Eighth Circuit in single employer cases

The seminal case in the Eighth Circuit for employment of the four-factor test that the parties suggest applies is <u>Baker v. Stuart Broadcasting Co.</u>, 560 F.2d 389 (8th Cir. 1977). The issue in <u>Baker</u> was whether the employees of separate but related companies should both be counted to determine whether the threshold requirement for number of employees for Title VII's applicability had been reached. The Eighth Circuit held that the employees of both companies should be counted if they were a deemed to be a single enterprise using a four-factor test used by a number of other federal courts. The test, which the court noted had originally been borrowed from standards promulgated by the National Labor Relations Board ("NLRB"), requires consideration of the following factors: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. <u>Id.</u> at 390–92.

More recently, the Eighth Circuit in <u>Sandoval v. Am. Bldg. Maint. Indus. Inc.</u>, 578 F.3d 787 (8th Cir. 2009) confirmed that the <u>Baker</u> four-factor test for determining whether separate but related companies should be treated as one enterprise for purposes of Title VII was still good law in the Eighth Circuit, with the issue in <u>Sandoval</u> being one of potential liability and not whether the employee numerical threshold had been reached. <u>Id.</u> at 792–95 ("The legal standard in this circuit for determining a parent corporation's liability for a subsidiary's commission of practices prohibited by Title VII was first set forth more than thirty years ago in <u>Baker</u>. <u>Id.</u> at 392. The court adopted a four-part test treating related but distinct entities as an integrated enterprise . . . ."). In reaffirming the validity of the four-factor test for related entities, the court noted that Congress itself had embraced the test by adding language first to the

ADEA and then later to Title VII and the ADA to address when an American corporation could be held responsible for discriminatory acts of a foreign corporation controlled by the American corporation. Id. at 792–95.

c.      **The differing tests used by courts outside of the Eighth Circuit in joint employer cases**

The focus in single employer cases is whether separate entities are sufficiently related such that they should be treated as single employer. However, as already noted, courts have not restricted the situations in which a person can be deemed to be an employee of more than one entity to only those where the entities related. For cases where the entities are unrelated which are brought pursuant to federal anti-discrimination laws that have essentially the same circular definitions of "employer" and "employee," it appears that most courts outside of the Eighth Circuit either employ one of two tests (the "common-law agency" test or the "hybrid" test) or list specific factors to be considered that are comparable to one of the two tests. The common-law agency test is sometimes referred to as the "control test" because its primary focus is the extent of control over the employee. The hybrid test gets its name because it employs the common-law agency test but supplements it, when appropriate, with consideration of economic factors similar to those employed by an "economic reality test" that is used by many courts in cases under the Fair Labor Standards Act ("FLSA"). See, e.g., United States Equal Opportunity Commission v. Global Horizons, Inc., 915 F.3d 631 (9th Cir. 2019) ("Global Horizons") (adopting the common-law agency test over the economic reality and hybrid tests); Scott v. Sarasota Doctors Hospital, Inc., 688 Fed.Appx. 878, 886–88 & n.12 (11th Cir. 2017) ("Scott") ("[W]e believe that the factors listed in the pattern instruction fairly target the economic realities of the [employment] relationship viewed in light of the common law

principles of agency and right of the employer to control the employee.") (internal quotations omitted); Nischan v. Stratosphere, LLC, 865 F.3d 922, 928–29 (7th Cir. 2017) ("Nischan") (employing a five-factor test that focuses upon control over the employee and economic factors); Faush v. Tuesday Morning, Inc., 808 F.3d 208, 213–14 (3d Cir. 2015) (adopting the common-law agency test over the FLSA test); Butler v. Drive Automotive Industries of America, Inc., 793 F.3d 404, 410–15 (4th Cir. 2015) ("Butler") (describing the the common-law agency, economic reality, and hybrid tests and adopting the latter).

As reflected in the above cited cases, it appears that many (if not most) courts outside of the Eighth Circuit in cases arising under federal anti-discrimination laws have concluded that use of the common-law agency test—or that test supplemented by consideration of economic factors (*i.e.*, the hybrid test)—is guided by (if not required) because of what the Supreme Court had to say first in Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318 (1992) ("Darden") and then later in Clackamas Gastroenterology Associates, P.C. v. Wells, 538 U.S. 440 (2003) ("Clackamas') about the significance of the statutory definitions of "employer" and "employee." The question in Darden was whether an insurance salesman was an independent contractor or an "employee" for purposes of the Employee Retirement Income Security Act of 1974 ("ERISA"). The question in Clackamas was whether four physicians who owned a medical professional corporation and actively practiced medicine under its auspices were employees of the corporation for purposes of the American with Disabilities Act of 1990 ("ADA') such that they should be counted in determining whether the employee numerical threshold for the ADA's applicability had been reached. In resolving the questions, the Court in both cases looked to the definitions of "employer" and "employee" under the laws at issue, which were essentially the same as those employed in the ADEA and Title VII. The Supreme Court noted the circularity of the definitions and concluded that, since the statutory

language added nothing to the commonly understood meaning of the terms, Congress must have intended the definitions to describe "the conventional master-servant relationship as understood by the common-law agency doctrine." Clackamas, 538 U.S. at 445 (quoting Darden, 503 U.S. at 322–23). After reaching that conclusion, the Court observed that the focus of common-law agency principles is one of control. Darden, 503 U.S. at 323 ("'In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished.'") (quoting Community for Creative Non–Violence v. Reid, 490 U.S. 730, 751–52(1989); Clackamas, 538 U.S. at 448 ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant."). The Court then proceeded in both cases to consider factors reflective of that focus. In Darden, it was the list of non-exclusive factors set forth in a prior Supreme Court decision that frequently are employed at common law to assess whether a person is an employee or an independent contractor. Darden, 503 U.S. at 323–24. In Clackamas, the Court focused upon six factors submitted by the EEOC that were relevant to the inquiry of whether a shareholder-director is an employee and focused upon "the common-law touchstone of control[.]" Clackamas, 538 U.S. at 448–49.

Several other points are worth noting about the joint employer cases outside of the Eighth Circuit. The Ninth Circuit had this to say about the differences between the various tests as a practical matter:

> We acknowledge that there may be little functional difference among the common-law agency test, the economic-reality test, and a third test that blends elements of the first two (the so-called "hybrid" test). See Murray v. Principal Financial Group, Inc., 613 F.3d 943, 945 (9th Cir. 2010). All three are fact-intensive tests that will usually produce the same outcome in a joint-employment analysis.

Global Horizons, 915 F.3d at 639.

In somewhat the same vein, the Third Circuit in <u>Faust</u>, while holding that <u>Darden</u> required using the common-law agency test, stated that the relevant incidents of the master-servant relationship to be weighed and considered in a joint employer case are somewhat different from those that were the focus in <u>Darden</u> given the differing circumstances. <u>Faust</u>, 808 F.3d at 214. The Third Circuit also noted two instances at common law in which a person may be an employee for more than one employer, *i.e.*, when a servant serves two masters at the same time or when one master "borrows" a servant to another. With respect to both of these points, the Third Circuit stated: The <u>Darden</u> factors assist in "drawing a line between independent contractors and employees" hired by a given entity. <u>Clackamas Gastroenterology Assocs., P.C. v. Wells</u>, 538 U.S. 440, 445 n. 5, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003). Significantly, the inquiry under <u>Darden</u> is not which of two entities should be considered the employer of the person in question. Two entities may be "co-employers" or "joint employers" of one employee for purposes of Title VII. <u>Graves v. Lowery</u>, 117 F.3d 723, 727 (3d Cir.1997). Indeed, at common law, one could be a "dual servant acting for two masters simultaneously" or a "borrowed servant" who by virtue of being " 'directed or permitted by his master to perform services for another may become the servant of such other.' " <u>Williamson v. Consol. Rail Corp.</u>, 926 F.2d 1344, 1349 (3d Cir.1991) (quoting Restatement (Second) of Agency § 227 (1958)).

808 F.3d at 214.

> ### d. The law in the Eighth Circuit with respect to what test is appropriate for joint employer cases

In arguing the <u>Baker</u> four-factor test applies not only to single employer but also joint employer cases, neither party cites to an Eighth Circuit decision that has applied the four-factor test in a case arising under federal anti-discrimination law requiring a joint employer analysis and where the issue is one of liability as opposed to whether the employee numerical threshold requirement has been satisfied. Rather, the only case that either party cites for authority is <u>Scheidecker v. Arvig Enterprises, Inc.</u>, 122 F. Supp. 2d 1031 (D. Minn. 2000) ("<u>Scheidecker</u>"), where the district court, after noting the distinction between "single entity" and "joint employer" cases, went on to state:

The Eighth Circuit applies the same four factors used in a single entity analysis to a joint

employer relationship.[4] See Pulitzer Publ'g. Co. v. NLRB, 618 F.2d 1275 (8th Cir.1980); Miscellaneous Drivers and Helpers Union, Local No. 610 v. NLRB, 624 F.2d 831 (8th Cir.1980).

Id. at 1038.[6]

Scheidecker's conclusion that the Eighth Circuit would apply the four-factor test for both single employer and joint employer federal civil rights has been cited with approval in at least one more recent case in the District of Minnesota as well as in decisions of several other district courts in the Eighth Circuit. See, e.g., Burnell, 2018 WL 4293150, at *13 (D. Minn. July 10, 2018) (citing Scheidecker); Walton v. Edge Medical Professional Services, LLC, 442 F. Supp. 2d 731, 748–49 (W.D. Mo. 2006) (same); cf. Stanley v. Hall, Civ. No. 05-5104, 2006 WL 3138824, *4 (D.S.D. Oct. 31, 2006) (citing Scheidecker but reaching only the issue of the employee numerical threshold). However, there are district court decisions within this Circuit that have employed, or suggested as appropriate, the common-law agency or hybrid tests in cases requiring a joint employer analysis and with no mention of the Baker four-factor test. E.g., Mann v. Missouri Home Therapy, LLC, No. 4:18-cv-01046, 2019 WL 2357352, at **3–4 (E.D. Mo. June 4, 2019); Tipton v. Sessions, No. 6:17-03179, 2018 WL 5928062, at *2 (W.D. Mo. Nov. 13, 2018) ("Tipton"); Shaupen Zhou v. International Business Machines Corp., No. 15-cv-1027, 2017 Wl 1217195, at *10 (N.D. Iowa March 31, 2017); Carpenter v. Princeton Public Schools, Civ. No. 2008 WL 11463251, at *9 (D. Minn. Nov. 14, 2008); Callicutt v. Pepsi Bottling Group, Inc., Civ. No. 00-95, 2002 WL 992757, at * 7 (D. Minn. May 13, 2002).

---

[6] The court noted in a footnote that other federal courts applied a different test in joint employer cases. Schneidecker, 122 F. Supp. 2d at 1038 n.4. Also, just prior to its conclusion that the four-factor test applies in joint employer cases, the court acknowledged that the primary focus is one of control, stating: "A finding of joint employer is proper where one company has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." Id. at 1038.

The undersigned does not believe the <u>Baker</u> four-factor test is the governing test in the Eighth Circuit for federal anti-discrimination cases that require a joint employer analysis and for which the issue is one of liability. <u>First</u>, the Eighth Circuit appears to have confined its use of the four-factor test to either single employer cases (<u>e.g.</u>, <u>Sandoval</u>) or to cases where the issue is whether the employee numerical threshold has been satisfied (<u>e.g.</u>, <u>Davis v. Ricketts</u>, 765 F.3d 823 (8th Cir. 2014); <u>Artis v. Frances Powell North Band</u>, 161 F.3d 1178, 1184 (8th Cir. 1998); <u>Massey v. Emergency Assistance, Inc.</u>, 724 F.2d 690 (8th Cir. 1984) (per curiam))—at least post-<u>Darden</u>.[7]

<u>Second</u>, <u>Scheidecker</u>'s reliance upon the NLRB cases it cited for authority is problematic. The focus of the NLRB's four-factor test in labor-relations cases is arguably not the same as for joint employer cases in federal anti-discrimination cases. <u>See</u> <u>Pulitzer Publishing. Co. v. NLRB</u>, 618 F.2d 1275, 1278–79 (8th Cir.1980).[8] Also, there is what <u>Darden</u> and <u>Clackamas</u> had to say about the statutory definitions of

---

[7] In the pre-<u>Darden</u> case of <u>Williams v. Evangelical Retirement Homes of Greater St. Louis</u>, 594 F2. 701 (8th Cir. 1979), the district court granted summary judgment in favor of the defendant, an entity operating a retirement home, concluding that the plaintiff, a food service worker, was not an employee of the defendant based upon the <u>Baker</u> four-factor test. The district court held that plaintiff was employed by a food service company that was an independent contractor to the defendant, and that the defendant exerted no control over the employment practices of the food service company. The Eighth Circuit reversed concluding there were relevant facts with respect to whether plaintiff was an employee of the defendant and whether the defendant had any role in plaintiff's discharge. In so concluding, the Eighth Circuit did not state one way or the other whether it agreed with district court's use of the four-factor test, which the Eighth Circuit characterized as a test "for determining whether two corporations could be considered as a single employer." <u>Id.</u> at 703. Given the uncertain and convoluted nature of the facts, including the possibility plaintiff was an employee only of defendant and/or that the food service was acting contractually as defendant's agent, this case does not appear to be precedent for use of the four-factor test in joint employer cases. But, if it is, the Eighth Circuit does not appear to have followed it post-<u>Darden</u>.

[8] The issue in <u>Pulitzer</u> was whether Pulitzer, which owned a newspaper, should be required to participate in labor negotiations with an unrelated company that employed drivers who delivered papers for the Pulitzer-owned newspaper. In deciding to employ the NLRB's four-factor test to resolve that question, the Eighth Circuit quoted the following passage from <u>Parklane Hosiery Co., Inc.</u>, 203 N.L.R.B. 597, 612, amended on other grounds, 207 N.L.R.B. 999 (1973):

> This Board's so-called "single employer" or "joint employer" concept defined and codified, with judicial concurrence, within a significant number of cases normally reflects a judgment that two or more nominally separate business entities may properly be considered sufficiently integrated to

22

"employer" and "employee" for purposes of the laws at issue in those cases, as well as, <u>Darden</u>'s statement

that the definition of "employee" under the National Labor Relations Act is materially different thereby

making the precedents interpreting its definition "feeble precedent[] for unmooring the term from the

common law." <u>Darden</u>, 503 U.S. at 324–25.

 <u>Third</u>, the four-factor test on its face appears to be ill-suited to cases requiring a joint employer

analysis since the focus of each of the four factors is upon the relationship of the entities in question and,

in joint employer cases, it is presumed they are unrelated. At best, the four factors bear only indirectly upon

the putative employer's control over the employee, which is the primary focus in joint employer cases. Or,

to put it another way, use of the four-factor test would make the most sense if the goal was to limit the

instances in which more than one entity could be deemed to be an employer to situations in which the

entities are substantially integrated, but, as noted in the cases cited above and the Eighth Circuit cases that

follow, that is not the state of the law.

 <u>Fourth</u>, there are the Eighth Circuit's post-<u>Darden</u> cases beginning first with <u>Wilde v. County of</u>

<u>Kandiyohi</u>, 15 F.3d 103 (8th Cir. 1994) ("<u>Wilde</u>"). As noted above, <u>Darden</u> was an ERISA case. In

<u>Wilde</u>, the Eighth Circuit addressed what test should be used in a Title VII and ADEA case to determine

---

warrant their unitary treatment, for various statutory purposes.

The principal factors which have normally been deemed relevant, when this Board must decide whether sufficient integration exists, have covered broadly certain demonstrable relationships between the several business entities concerned; the board considers whether their total relationship reveals: (1) some functional interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. While none of these factors, separately viewed, have been held controlling, stress has normally been laid upon the first three factors which reveal functional integration with particular reference to whether there is centralized control of labor relations.

<u>Pulitzer</u>, 618 F.2d at 1278–79.

whether the plaintiff, an individual operating a small business, was an employee of the defendants or an independent contractor. In agreeing with the district court that the plaintiff was not an employee within the meaning of the two laws and, instead, an independent contractor, the court rejected plaintiff's argument for use of the broad "economic realities" test that a number of courts have employed to determine whether a person is an employee for purposes of the FLSA. The court noted that most of the appellate courts in Title VII or ADEA cases had "applied a test described as a hybrid of the common-law test and the economic realities test" and not the economic realties test alone, which was thought to be broader and consistent with the FLSA's more expansive definition of "employee." Id. at 105. The court then described the hybrid test and concluded it did not conflict with what the Supreme Court had recently decided in Darden. More specifically, the Eighth Circuit stated:

> * * * * Under the hybrid test, the term "employee" is construed in light of general common-law concepts, taking into account the economic realities of the situation. Cobb, 673 F.2d at 340–41.
>
> To decide whether a person is an employee or independent contractor under the common law of agency, the totality of the working relationship is examined. The Restatement provides a nonexhaustive list of factors for consideration. See Restatement (Second) of Agency § 220(2) (1958). The hiring party's right to control the manner and means of the worker's product is an important, but not dispositive, factor. Id. comment i. Under the hybrid test, a court typically weighs the common-law factors listed in the Restatement and some additional factors related to the worker's economic situation, like how the work relationship may be terminated, whether the worker receives yearly leave, whether the worker accrues retirement benefits, and whether the hiring party pays social security taxes. See, e.g., Oestman, 958 F.2d at 305.
>
> In deciding Wilde is not an employee of the Authority or the Partnership within the meaning of Title VII, the district court applied the hybrid test. Wilde asserts the district court should have applied the broader economic realities test of Armbruster. We disagree.
>
> The Supreme Court recently stated that when a statute does not helpfully define the term "employee," courts should not imply a meaning that is broader than the common-law definition. Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, ——–——, 112 S.Ct. 1344, 1348–49, 117 L.Ed.2d 581 (1992) (adopting common-law test for deciding who qualifies as

an "employee" under ERISA). The Supreme Court rejected the lower court's view that the term should be construed " 'in the light of the mischief to be corrected and the end to be attained [by the statute],' " id. 503 U.S. at ——, 112 S.Ct. at 1349 (quoting Hearst, 322 U.S. at 124, 64 S.Ct. at 857), the same reasoning used to justify the economic realities test in Armbruster. The Supreme Court noted it had abandoned this view, and now presumes Congress intended a common-law definition for the term "employee" unless Congress clearly indicates otherwise. Id. Application of the economic realities test results in Title VII coverage for some common-law independent contractors because they are vulnerable to discrimination arising in the course of their work. Because the economic realities test is based on the premise that the term should be construed in light of Title VII's purpose and the construction is broader than at common law, Darden precludes the test's application.

In Darden, the Supreme Court summarized the common-law test as follows:
> "In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

Id. 503 U.S. at ——, 112 S.Ct. at 1348 (quoting Community for Creative Non–Violence v. Reid, 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989)) (citing Restatement (Second) of Agency § 220(2) (1958); Rev.Rul. 87–41, 1987–1 Cum.Bull. 296, 298–99). We see no significant difference between the hybrid test and the common-law test articulated by the Supreme Court in Darden. See id.; Cobb, 673 F.2d at 340–41; see also Frankel v. Bally, Inc., 987 F.2d 86, 90 (2d Cir.1993) (holding that common-law agency principles alone should be applied to decide whether a person is an employee under the ADEA, but hybrid test is practically the same as the common-law test). Under both tests, all aspects of the working relationship are considered. The Restatement's list of common-law factors used in both tests is nonexhaustive, and consideration of the additional economic factors does not broaden the traditional common-law test. Indeed, by adding employee benefit and tax treatment factors to the Restatement factors in its explanation of the common-law test, the Supreme Court recognized the common-law test encompasses economic factors. We thus conclude the district court applied the proper test to decide whether Wilde was an employee for the purposes of Title VII. See 811 F.Supp. at 451–52.

15 F.3d at 105–06.

While Wilde involved the question of whether an individual was an employee or independent

contractor in a case like <u>Darden</u> where the individual had no other employer, the Eighth in <u>Hunt v. State</u>

<u>of Missouri, Department of Corrections</u>, 297 F.3d 735 (2002) also used the hybrid test to determine

whether a person, who was an acknowledged employee of one entity, was also an employee of another

entity for purposes of Title VII. In <u>Hunt</u>, the plaintiffs were nurses employed by Favorite Nurses, which

was a staffing agency that provided nurses to defendant Missouri Department of Corrections ("DOC") on

a temporary basis. While Favorite Nurses initially hired plaintiffs and paid them for their service, the DOC

approved the assignment of each plaintiff to perform work for the DOC, reimbursed Favorite Nurses for

the compensation it paid plaintiffs, and controlled virtually every other aspect of the plaintiffs' work

environment. Further, while providing services to the DOC, plaintiffs were not doing work for others. <u>Id.</u>

at 742–43. The issue was whether the DOC was also an employer of the plaintiffs for purposes of Title

VII.

The DOC took the position that Favorites Nurses was the employer of the plaintiffs and that the

plaintiffs vis-a-vis the DOC were independent contractors. The DOC also argued that plaintiffs could not

be employees of both Favorite Nurses and the DOC. The Eighth Circuit rejected both arguments. In

concluding that the DOC was also an employer of the plaintiffs for purposes of Title VII, the court used

the hybrid test it held in <u>Wilde</u> applied in ADEA and Title VII cases with no mention of the <u>Baker</u> four-

factor test. More specifically, the court stated:

> The law is well established that Title VII protects employees, not independent contractors,
> from discriminatory employment practices. <u>See</u> <u>Schwieger</u>, 207 F.3d at 483 (citing <u>Wilde v.</u>
> <u>County of Kandiyohi</u>, 15 F.3d 103, 104 (8th Cir.1994) (<u>Wilde</u>)). In <u>Schwieger</u>, we observed
> that Title VII's "nominal definition of an 'employee' as 'an individual employed by an
> employer,' 42 U.S.C. § 2000e(f), 'is completely circular and explains nothing.' " <u>Id.</u> (quoting
> <u>Darden</u>, 503 U.S. at 323, 112 S.Ct. 1344). We thus reasoned that Congress must have
> intended the term to be read according to the common law agency definition. See id.
> Determining whether a party is an employee or an independent contractor, we explained,

requires a fact-intensive consideration of " 'all aspects of the working relationship' between the parties." Id. (quoting Wilde, 15 F.3d at 106). Moreover, while the right to control the manner and means by which tasks are accomplished is a primary consideration, no single factor is decisive. See id. at 483–84. In Schwieger, we also discussed twelve specific factors identified in Darden as relevant to this inquiry, but we then went on to caution that the list of factors is nonexhaustive and the inquiry must take into account the "economic realities" of the worker's situation. Id. at 484. Notably, we specifically cautioned that "[t]he existence of a contract referring to a party as an independent contractor does not end the inquiry, because an employer 'may not avoid Title VII by affixing a label to a person that does not capture the substance of the employment relationship.' " Id. at 483 (quoting Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 81 (8th Cir.1996), cert. denied, 520 U.S. 1211, 117 S.Ct. 1694, 137 L.Ed.2d 821 (1997)). Applying the analysis set forth in Schwieger and similar precedents, we now hold that the district court did not err in concluding, based upon the control exercised by others over the terms and conditions of plaintiffs' work, that at all relevant times plaintiffs worked at JCCC as employees rather than as independent contractors.

297 F.3d at 741–42. As for the DOC's argument that plaintiffs could not have two employers, the Eighth

Circuit stated:

> We now turn to DOC's argument that plaintiffs could not have been employees of both Favorite Nurses and DOC, for purposes of conferring standing to sue under Title VII. We disagree. To begin, nothing in the law precludes the possibility that a person may have two or more employers for the same work. In the present case, the undisputed fact that plaintiffs were employed by Favorite Nurses for the work they were doing at JCCC was a factor to be considered by the district court in assessing plaintiffs' employment status vis-a-vis DOC, but it was not the decisive factor.

Id. at 742.

While Hunt involves one situation in which an employee can have two employers, there is no reason

to believe the Eighth Circuit would restrict the use of the hybrid test to "staffing agency" or "borrowed

servant" types of joint employer cases and then use the four-factor Baker test for others. This is because

the ultimate question remains the same. That is, whether a particular entity or person is an employer, albeit

at the same time as another, and not whether separate but related entities should be considered as a single

enterprise. And, as to the former, the Eighth Circuit has clearly held that common-law agency factors must

be looked to, including any relevant economic considerations, with the primary consideration being one of control.[9]

### e.     What test is appropriate for purposes of the NDHRA

Liability for age discrimination under N.D.C.C. § 14-2.4-03[10] extends only to "employers." In subpart (8) of § 14-02.4-02, the NDHRA defines an employer to be a person who employs one or more "employees" with certain refinements not relevant here and in subpart (7) defines an "employee," to be "a person who performs services for an employer, who employs one or more individuals, for compensation, whether in the form of wages, salaries, commission, or otherwise[,]" but with certain exceptions also not relevant here.

As noted previously, neither plaintiff nor NDPL in their briefing addressed what test the North Dakota Supreme Court would apply to determine whether NDPL was also plaintiff's employer for purposes of the NDHRA and the court is not aware of any North Dakota Supreme Court case that has addressed the issue. Assuming, without deciding, that the North Dakota Supreme Court would construe the NDHRA to allow for an employee having two employers in appropriate situations—even if the

---

[9]  Upon summary judgment, a court may be able to "shoehorn" into the four-factor test consideration of the points relevant to a joint employer analysis by ignoring the common ownership factor and altering the focus of the others. Where the four-factor test appears to be particularly problematic is when the court must deny summary judgment and has to instruct the jury on what factors to consider. Cf. Scott, 688 Fed.Appx. at 886–87; Ling Nan Zheng v. Liberty Apparel Co. Inc., 617 F.3d 182, 185–87 (2d 2010); Ernster v. Luxco, Inc., 596 F.3d 1000, 1005–07 (8th Cir. 2010).

[10]  Plaintiff does not allege in Count Two of his Second Amended Complaint which provision of the NDHRA he claims was violated. Even though entitled "Retaliation prohibited," N.D.C.C. § 14-02.4-18 in part provides that [i]t is a discriminatory practice for a *person* to conceal unlawful discrimination or aid, abet, compel, coerce, incite, or induce another person to unlawfully discriminate in violation of this chapter . . . ." (emphasis added). In responding to NDPL's motion for summary judgment, plaintiff does not argue that NDPL aided, abetted, or incited CLS in committing an act of age discrimination and contends only that NDPL is liable as a joint employer, presumably pursuant to § 14-2.4-03. Further, there appears to be a good reason why plaintiff did not attempt to make the argument that NDPL was an aider or abetter—that being the overwhelming evidence that CLS removed plaintiff from the Project because of NDPL's exercise of its rights under the MSA and not for any unlawful reason on its part.

employers are unrelated, the court predicts the North Dakota Supreme Court would employ a common-law agency analysis including consideration of economic factors as appropriate (*i.e.*, the hybrid test).

First, the North Dakota Supreme Court will, but not always, look to federal court decisions under analogous federal statutes prohibiting discrimination. Miller v. Medcenter One, 1997 ND 231, ¶ 10, 571 N.W.2d 358 ("While there are similarities between our state law and federal anti-discrimination laws, this Court applies a federal interpretation only when it is helpful and sensible."). Second, the North Dakota Supreme Court is likely to find persuasive: (i) the reasoning employed by the Supreme Court in Darden and Clackamas in construing comparable (albeit not the same) definitions of "employer" and "employee" to reflect their common-law meaning thereby making appropriate a common-law agency analysis; (ii) the Eighth Circuit's decision in Wilde that consideration of economic factors as appropriate is not inconsistent with an analysis based upon common-law agency principles; and (iii) the Eighth Circuit's decision in Hunt employing the hybrid test in a joint employer case. Third, the use of the hybrid test is consistent with the statutory definition of "employee" under the NDHRA as well as North Dakota's use of essentially the same common law test employed in Darden to determine whether a person is an employee as opposed to an independent contractor, which the North Dakota Supreme Court states, like Darden, focuses upon control. See, e.g., State ex rel. Workforce Safety & Ins. v. Larry's On Site Welding, 2014 ND 81, ¶¶ 15–22, 845 N.W.2d 310; Matter of BKU Enterprises, Inc., 513 N.W.2d 382, 384–85 (N.D. 1994); Newman v. Sears, Roebuck & Co., 43 N.W.2d 411, 470 (N.D. 1950). While the court reaches its conclusion for these reasons, it notes that the Eighth Circuit concluded in Birchem v. Knights of Columbus, 116 F.3d 310 (8th Cir. 1997) that there was nothing to suggest that the North Dakota Supreme Court "would decline to apply the common law agency test in distinguishing between employees and independent contractors." Id.

at 324. Also, the Eighth Circuit predicted the same thing with respect to South Dakota's Human Rights Act containing a definition of "employee" identical to the NDHRA. Alexander v. Avera St. Luke's Hospital, 768 F.3d 756, 765–65 (8th Cir. 2014).

## 2.    Applying the hybrid test

In accordance with foregoing discussion, the focus in determining whether NDPL was an employer of plaintiff for purposes of the ADEA and the NDHRA is the extent to which it exercised control over plaintiff's work environment or shared it with CLS—both legally and practically. Relevant are all aspects of plaintiff's working relationship with NDPL, bearing upon the issue of control, including economic factors and the fact plaintiff had an employment relationship with CLS and the incidents of that relationship.

As detailed earlier, the contract between NDPL and CLS provided that CLS would be an independent contractor, CLS would be responsible for the "specific manner, means, and methods" of services performed, and that any personnel furnished by CLS would not be employees of Enbridge or it affiliated companies unless specifically provided otherwise. While the contract is not dispositive, it obviously is an important fact to consider. See, e.g., Glascock v. Linn County Emergency Medicine, PC, 698 F.3d 695, 699 (8th Cir. 2012); Williams v. Evangelical Retirement Home of Greater St. Louis, 594 F.2d 701, 704 (8th Cir. 1979); Tipton, 2018 WL 5928062, at *5. And, in this instance, the following supports a conclusion that the parties for the most part maintained the contractual distinctions between the parties and their employees:

- Plaintiff had a long-standing employment relationship with CLS before the Sandpiper Project. Further, this relationship continued for a period of time after plaintiff was removed from Project, albeit with his being placed on furlough status, which did not change until he

30

elected to end his relationship with CLS.

- CLS assigned plaintiff to work on the Project and there is no evidence that it required NDPL's prior approval.

- CLS paid plaintiff for the work he performed and his expenses.

- Plaintiff reported to CLS supervisors and there is no evidence that plaintiff *regularly* reported directly to any NDPL personnel apart from what CLS was required to generally report about in terms of the performance of its work.

- When NDPL sought to have plaintiff removed from the Project, it contacted plaintiff's supervisor in exercising its contractual rights and did not communicate directly with plaintiff. CLS management then decided to comply with NDPL's invocation of its contract rights and communicated to plaintiff that he was being removed from the Project.

- There is no evidence that NDPL *regularly* and *directly* controlled the manner in which plaintiff carried out his supervisory duties over the right-of-way agents working under him. In fact, when plaintiff became concerned that Darryl Sayler at one point was overstepping his bounds in imposing work requirements directly upon the right-of-way agents under plaintiff's supervision, plaintiff complained and was advised it would be corrected. This evidence supports the conclusion that plaintiff himself believed and understood that the CLS employees working under his supervision were directly answerable to him and inferentially that he was directly answerable and subject to the control of CLS management.

- While NDPL closely monitored CLS's performance and provided direction when it

concluded its expectations were not met, the evidence supports the conclusion that the extent it did so in this case was reflective of its disappointment (whether right or wrong) with CLS's performance and not that it had de facto assumed the role of being the employer of CLS personnel, including plaintiff.

- While NDPL required that CLS use its right-of-way management software and for the right-of-way files to be kept in certain manner, this was in large part because it wanted the information kept and assembled in manner that would facilitate its use long after CLS' role on the Project ended and be uniform with how it handled its other rights-of-way, including that acquired on NDPL's behalf by CLS's competitors on other projects. There is no evidence that NDPL furnished plaintiff or the right-of-way agents he supervised with other tools that they used to perform their work, *e.g.*, paper (apart from lease forms), writing implements, and vehicles. Also, CLS provided it own office space.

See, e.g., Carpenter, 2008 WL 11463251, at **10–12 (considering similar points in concluding that an employee of a bus service was not also an employee of the school district).

Although it does appear plaintiff would not have been removed from the Project but for NDPL's exercise of its contract rights, NDPL did not terminate plaintiff from CLS's employment nor did it have the right to do so. Further, it is not uncommon for one contracting party to be given the right to require the other party to remove an employee from the worksite and courts have held that the exercise of such rights does not by itself make the party exercising the right an employer. See, e.g., Scott, 688 Fed.Appx. at 881, 887–88 (hospital's exercise of right to exclude a hospitalist employed by a company that provided it with physicians did not make the hospital an employer of the hospitalist); Love v. JP Cullen & Sons, Inc., 779

F.3d 697, 703–04 (7th Cir. 2015) (general contractor's exercise of right to remove employee of a second tier subcontractor from the worksite did not make general contractor an employee of the removed worker); Carpenter, 2008 WL 11463251, at **10–11 (school district's exercise of its right to remove a school bus driver employed by a bus service that it contracted with to bus its students dis not make the school district an employer of the removed driver).

In short, the facts of this case are substantially different from the "staffing agency" cases like Hunt and the Fourth Circuit's decision in Butler where the staffing agency hires and pays the employees but the entity with whom it contracts otherwise controls the work environment. Carpenter, 2008 WL 11463251, at *11 (similarly distinguishing Hunt). Further, the relevant and indisputable evidence does not support the conclusion that NDPL and CLS shared control over plaintiff and his work environment such as to make NDPL a joint employer. That being the case, the court concludes that NDPL was not plaintiff's employer for purposes of either the ADEA or the NDHRA as a matter of law[11] and that his age discrimination claims are subject to dismissal on this basis alone.

**B.      Even if NDPL was plaintiff's employer, the evidence is insufficient to create a jury issue that plaintiff's removal from the Sandpiper Project was because of age discrimination in violation of either the ADEA or the NDHRA**

**1.      Lack of "direct" evidence requires use of the McDonnell Douglas framework**

In the context of laws prohibiting discrimination, "direct" evidence is evidence that suggests a direct causal link between the alleged discriminatory animus and the challenged decision, and, in the Eighth Circuit,

---

[11]   In the Eighth Circuit, the question of whether an entity is an employer for purposes o federal laws prohibiting discrimination is a mixed question of law and fact. Ernster v. Luxco, Inc., 596 F.3d 1000, 1005–07 (8th Cir. 2010); see Hunt, supra (affirming district court's resolution of the issue upon summary judgment). It appears the same would be true under North Dakota law based on the cases cited earlier.

"direct evidence" is not necessarily the converse of circumstantial evidence. See, e.g., Floyd-Gimon v. Univ. of Ark. for Medical Sciences ex rel. Bd. of Trustees of Univ. of Ark., 716 F.3d 1141, 1149 (8th Cir. 2013); Griffeth v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004); In Griffeth, the Eighth Circuit stated:

> Direct evidence in this context is not the converse of circumstantial evidence, as many seem to assume. Rather, direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action. Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997). Thus, "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part McDonnell Douglas analysis to get to the jury, regardless of whether his strong evidence is circumstantial.

Griffeth, 387 F.3d at 735-36; but see Torgerson v. City of Rochester, 643 F.3d 1031, 1053 (8th Cir. 2011) (en banc) ("Torgerson") (Colloton, J., concurring) (expressing doubt about Griffeth's definition of direct evidence in light of the Supreme Court's discussion of direct versus circumstantial evidence in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) and other Supreme Court precedent).

Actions or remarks that reflect a discriminatory animus by an employer or by an individual closely involved in the employment decision may, depending upon context, constitute direct evidence. See, e.g., Beshears v. Asbill, 930 F.2d 1348, 1354 (8th Cir. 1991). In contrast, stray remarks in the workplace, statements by nondecisionmakers, and remarks by decisionmakers unrelated to the decisional process do not constitute direct evidence. Tymon v. Wells Fargo, Co., 462 F.3d 925, 933–34 (8th Cir. 2008); see also Torgerson, 643 F.3d at 1044–46 ("A remark by a decisionmaker, in order to be direct evidence of . . . discrimination must show a specific link between a discriminatory bias and the adverse employment action, sufficient to support a finding by a reasonable fact-finder that the bias motivated the action.").

Plaintiff alleges that four NDPL employees made inquiries or comments about his age, why he continued to work given his age, and his plans for retirement. However, as discussed in more detail below, only one instance of remarks relied upon plaintiff was made by a person closely involved in the challenged employment action. And, with respect to that one instance, there is no evidence specifically linking the remarks to the decisional process. Given the lack of direct evidence, this court must analyze the record evidence under the <u>McDonnell Douglas</u>[12] framework that applies to the ADEA claim of age discrimination (<u>see</u>, <u>e.g.</u> <u>Roeben v. BG Excelsior Ltd. Partnership</u>, 545 F.3d 639, 642 (8th Cir.2008)) and the modified <u>McDonnell Douglas</u> frame work that applies to the NDHRA claim (<u>see</u>, <u>e.g.</u>, <u>Spratt v. MDU Resources Group, Inc.</u>, 2011 ND 94, ¶¶ 10–11, 797 N.W.2d 328).

### 2. NDPL had legitimate nondiscriminatory reasons for requesting plaintiff's removal from the Project

Plaintiff's evidence that his removal on the Project was because of his age focuses upon purported inquiries/comments by four NDPL employees about his age, why he wanted to continue working at his age, and whether he had any plans to retire. According to plaintiff, these age and retirement related inquiries/comments were made at various times during the Project by Darryl Sayler, Trevor Seely, Jay Manders, and Mike Bradburn. (Doc. No. 26-1, pp. 138–49).

When asked about these inquiries/comments during his deposition, plaintiff stated the remarks by Trevor Seely were made one time and before Seely moved onto another project in Michigan in 2014. The comments made by Jay Manders, who was then working in Minnesota, were likewise made only one time during a roundtable meeting of CLS and NDPL personnel in Minnesota during the middle of the Project

---

[12] <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

and in the context of plaintiff having worked years ago with a father of one of the persons Enbridge had hired. (Id., p. 145–47). There is a dearth of evidence that the remarks made by Seely or Manders were anything more than casual conversation, much less that they were causally related to NDPL requesting that he be removed from the Project.

As for Mike Bradburn, who the evidence suggests was directly involved in the decision to seek plaintiff's removal from the Project, plaintiff stated that the remarks he made likewise were only one time and occurred after Bradburn had stopped by the Minot office and the two had conversed about a complaint plaintiff had lodged with NDPL about Darryl Sayler interfacing too directly with CLS personnel and pushing them too hard and Bradburn remarking that Enbridge upper management was taking care of the situation. Plaintiff testified that the subject of his age came up after the brief meeting when he remarked to Bradburn in the parking lot that their management styles were old school as opposed to implicitly those of Sayler. According to plaintiff, Bradburn at that point asked plaintiff how old he was and why he had not retired given his age and that he responding stating he was not ready, he was in good health, and that he had just lost his wife and wanted to keep busy. (Id., pp. 147–48). There is no evidence that the remarks of Bradburn made went beyond this or that he brought up the subject of plaintiff's age later when he and McKay jointly decided that they should seek a management change on the North Dakota segment along with other adjustments in CLS's project management on the Minnesota segment.

Finally, plaintiff testified that Darryl Sayler several times commented about his age and his plans for retirement. As noted earlier, Sayler was the NDPL person who directly interfaced with plaintiff and his team on the North Dakota segment and with whom plaintiff had some conflict. The evidence, however, is that Sayler was not the decisionmaker with respect to NDPL requesting that plaintiff be removed from

36

the Project. Rather, the evidence is that the decision was made by McKay in consultation with Bradburn and plaintiff conceded as much in his briefing. Further, even if Sayler recommended to Bradburn and/or McKay that plaintiff be removed from the Project and did so based upon an inappropriate age-related animus (and there is no evidence this actually happened), there is a dearth of evidence that plaintiff's age was the reason why McKay, in consultation with Bradburn, directed CLS to remove plaintiff from the project. Plaintiff acknowledged that McKay had not at any point commented about his age and that McKay was not a party to any of the conversations in which other NDPL made remarks touching upon his age or retirement plans. (Id., p. 144–48). In fact, McKay had known plaintiff for years having worked with him on other projects. And, after CLS assigned plaintiff to the Project, McKay (who was obviously aware of plaintiff's advanced age given their prior relationship) sent plaintiff the following email:

> Dan, glad you're working with us! You're one of the best I've had the pleasure of working with in my 22 year career in land.

McKay testified that later he had concerns about the number of document errors and other CLS performance issues. And, while remaining complimentary of plaintiff's work on the Project in terms of the percentage of right-of-way procured for the North Dakota segment and the speed with respect to which it was acquired, he concluded that a stronger manager was needed for the North Dakota segment and this was the reason why he decided plaintiff should be removed from that position. (Doc. No. 26-2, pp. 62–68).

Juxtaposed against the evidence that plaintiff proffers is the overwhelming evidence that NDPL, rightly or wrongly, was dissatisfied with CLS's performance on the Sandpiper Project and that it, wisely or unwisely, elected to address the perceived deficiencies by demanding that CLS make management

changes, including removing plaintiff from the Project.[13] This evidence, as detailed earlier, includes: (1) contemporaneous emails and other communications articulating NDPL's dissatisfaction with CLS's performance; (2) NDPL's prior requests for other CLS management changes, including replacement of plaintiff's Minnesota counterpart, who at the time was 33 years old (albeit this was more than a year earlier); (3) NDPL's articulated reasons for demanding plaintiff's removal from the Project as set forth in the email from Bradburn within days of plaintiff being notified and also in what plaintiff claims his supervisor Liz Babcock stated were the reasons NDPL stated orally to her for why plaintiff's removal from the Project was sought; (4) the fact that NDPL requested other CLS management and staffing changes at the same time it sought to have plaintiff removed from the Project, *i.e.*, providing additional management support for the Minnesota segment and adding an additional support person in the Grand Forks office; (5) NDPL's subsequent conduct in terminating it relationship with CLS and eventually suing it for its alleged deficient performance, and (6) the lack of mention by plaintiff of age discrimination in his lengthy email immediately following his learning he was being removed from the Project.

While it is questionable whether plaintiff has successfully made out a prima facie case of age discrimination, NDPL has come forward with sufficient evidence demonstrating it requested plaintiff's removal from the Sandpiper Project for a legitimate nondiscriminatory reason that was not frivolous.

---

[13] Plaintiff's contention that he was not personally responsible for certain of the deficiencies claimed by NDPL is unavailing. What is important here are NDPL's perceptions with respect to CLS's performance and who it perceived had management responsibility for the purported deficient performance. The fact NDPL may have unwisely painted with a too broad a brush in seeking plaintiff's removal is beside the point. See, e.g., Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 612 (8th Cir. 2014) ("[T]he 'critical inquiry in discrimination cases like this one is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.") (internal quotations and citing authority omitted); Dorsey v. Pinnacle Automation, Inc., 278 F.3d 830, 837–38 (8th Cir. 2002) (the question is not whether the articulated reason was for the action taken was misguided but rather whether the articulated reason was a pretext for discrimination).

Further, since no reasonable jury could conclude otherwise based upon facts that are either undisputed or not sufficiently controverted and hold that plaintiff was removed from the Project because of his age, NDPL is entitled to summary judgement of dismissal of is age discrimination claims regardless of whether the federal <u>McDonnell Douglas</u> framework or the modified <u>McDonnell Douglas</u> framework employed by the North Dakota Supreme Court is used.

## V.     ORDER

Based on the foregoing, defendant's motion for summary judgment (Doc. No. 25) is **GRANTED** and plaintiff's second amended complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

Dated this 9th day of October, 2019.

*/s/ Charles S. Miller, Jr.*
Charles S. Miller, Jr., Magistrate Judge
United States District Court